UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ESSENTIAL UTILITIES, INC. f/k/a AQUA AMERICA, INC. and AQUA ILLINOIS, INC.<br>762 W. Lancaster Avenue<br>Bryn Mawr, PA 19010 | : : : : : : | CIVIL ACTION<br><br>NO. _____<br><br>**JURY TRIAL DEMANDED** |
| Plaintiffs,<br>v. | : : : | |
| SWISS RE GROUP<br>1301 Avenue of the Americas<br>New York, NY 10019 | : : : : | |
| SWISS RE CORPORATE SOLUTIONS, LTD.<br>1301 Avenue of the Americas<br>New York, NY 10019 | : : : : : | |
| and | : : | |
| NORTH AMERICAN ELITE INSURANCE COMPANY<br>5200 Metcalf Avenue<br>Overland Park, KS 66202 | : : : : : | |
| Defendants. | | |

## **COMPLAINT**

Plaintiffs Essential Utilities, Inc., formerly known as Aqua America, Inc. ("Essential Utilities") and Aqua Illinois, Inc., ("Aqua Illinois") (Essential Utilities and Aqua Illinois being collective "Plaintiffs"), through their undersigned counsel, file this civil complaint (the "Complaint") against the above-referenced Defendants and alleges as follows:

## INTRODUCTION

1. This action arises from Defendants' bad faith refusal to provide coverage or honor its duty to defend for loss and the costs of defense incurred by Plaintiffs in connection with a putative class action lawsuit in which Aqua Illinois is a named Defendant. Despite receiving notice of the claim in June 2019, the Defendants have reserved all their purported rights under the policy at issue, thereby denying Plaintiffs the benefits of the policy for which Essential paid a substantial premium, imposing substantial costs on Plaintiffs and hindering Plaintiffs' defense of the putative class action lawsuit.

## PARTIES

2. Essential Utilities, f/k/a Aqua America, Inc., is a Pennsylvania corporation with its principal place of business and executive offices in Bryn Mawr, Pennsylvania.

3. Aqua Illinois is an Illinois corporation with offices in Kankakee, Illinois, and is a wholly owned subsidiary of Essential Utilities.

4. Defendant Swiss Re Group is a Zurich, Switzerland-based international insurance and reinsurance company, organized under the laws of Switzerland, maintaining its principal offices in the United States in New York, New York.

5. Defendant Swiss Re Corporate Solutions, Ltd. is a Zurich, Switzerland-based commercial insurance and reinsurance member of Swiss Re Group, organized under the laws of Switzerland (referred to jointly with Swiss Re Group herein as "Swiss Re"), maintaining its principal offices in the United States in New York, New York.

6. Defendant North American Elite Insurance Company ("NAE") is an underwriting company of Swiss Re, which issued the Policy at issue in this action. Swiss Re and NAE are referred to herein jointly as "Defendants."

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action under 28 U.S.C. §1332(a)(3) because the matter in controversy exceeds $75,000, exclusive of interests and costs, and is between citizens of different states and citizens of a foreign state.

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Essential Utilities resides in this District, and under 28 U.S.C. § 1391(b)(2) a substantial part of the events giving rise to the claims in this action occurred in this District.

## FACTUAL BACKGROUND

9. Aqua Illinois provides water to the residents of the Village of University Park, Illinois (the "Village").

10. On November 20, 2018, the Illinois Environmental Protection Agency issued an operating permit to Aqua Illinois authorizing it to introduce a blended phosphate into the water supplied to the Village.

11. Under the Illinois Pollution Control Board's public water supply regulations governing lead and copper, 35 Ill. Admn. Code Part 611, Subpart G, ("Board PWS Regulations") Aqua Illinois is required to sample for lead periodically in the drinking water at the faucets of a certain number of homes in the Village.

12. Section 611.350(c) of Board PWS Regulations provides that 15 micrograms per liter ("ug/L") is the "action level" for lead in drinking water. The action level is triggered when the concentration of lead in drinking water tested in more than 10% of the samples, exceeds 15 ug/L.

13. In late May 2019, Aqua Illinois conducted water testing on a sampling of homes in the Village the results of which reflected a 90th percentile lead concentration for the sample of 131 ug/L, which exceeded the action level under the Board PWS Regulations.

14. On June 14, 2019, Aqua Illinois issued a "do not consume" notice to all residents of the Village not to consume water from their tap until further notice.

15. On or about the same time, Aqua Illinois began adding a new blended phosphate comprised primarily of orthophosphate, to the water provided to the Village's residents. The new blend was introduced, in part, to prevent lead on plumbing and solder from leaching into the water supply.

16. Aqua Illinois provided potable water to residents of the Village and took and continues to take measures to ameliorate the health risks and property damage associated with the leaching of lead into the water system serving the residents of the Village.

17. On or about June 14, 2019, Essential gave a Loss Notice (the "Claim") to all of its insurance carriers, as summarized in **Exhibit 1**. The Defendants assigned the Notice Claim Number 020191420893.

18. On September 3, 2019, a putative class action complaint was filed against Aqua Illinois (the "Class Action Lawsuit"). A copy of the complaint in the Class Action Lawsuit is attached as **Exhibit 2**.

19. The complaint in the Class Action Lawsuit alleges the defendant's actions caused "a change in the water chemistry" of the water supplied by Aqua Illinois to the Village residents that "caused lead to leach out of solder and other plumbing/piping materials." Ex. 2, ¶ 37.

20.     The complaint further alleges the elevated levels of lead in the water expose Class members "to injury and the fear of future injury, including the risk of increased and irreversible health impacts, especially to young children." *Id.* at ¶ 55.

21.     On September 9, 2019, the Attorney General of Illinois brought suit against Aqua Illinois for Injunctive Relief and other remedies (the "State of Illinois Lawsuit").  A copy of the State of Illinois complaint is attached as **Exhibit 3**.  Like the complaint in the Class Action Lawsuit, the complaint in the State of Illinois Lawsuit alleges that the introduction of a blended phosphate in late 2018 caused a change in the source water chemistry that resulted in the removal of a protective scale from residential plumbing within homes in the Village. Ex. 3, ¶¶ 21-22.  The State of Illinois further alleged that the addition of a new blend of phosphate comprised primarily of orthophosphate in or about June 2019 was intended to prevent further leaching of lead into the water supply. *Id.* at ¶31.

22.     The Class Action Lawsuit includes allegations of nuisance (Count I), negligence (Count II), trespass (Count III), and seeks recovery for damages to persons and property.

### Chubb Policy

23.     Essential Utilities maintained Premises Pollution Liability Insurance with Chubb/ACE American Insurance Company for the policy period October 1, 2018 to October 1, 2021 (the "Chubb Policy") with a Products Pollution Coverage Endorsement. This endorsement defines "Product Pollution" as a "pollution condition" resulting from the use of potable, reclaimed, or recycled water sold or distributed by the insured.  This endorsement provides a sublimit of $5,000,000 per Product Condition. A copy of the Chubb Policy is attached as **Exhibit 4**.

24.     It is undisputed that Aqua Illinois is insured under the Chubb Policy acquired by Essential Utilities.

5

25. Plaintiffs have exhausted coverage under the Chubb Policy through a combination of indemnity payments and defense costs. The indemnity payments alone have been more than $2,700,000. The term "Loss" as defined in the Chubb Policy includes "legal defense expense."

**Defendants' Excess Policies**

26. Defendants, acting through NAE, issued Excess General Liability Insurance Policies Nos. UMB2000067 001 (October 1, 2017 to October 1, 2018) (the "2017 Policy") and UMB20000667 01 (October 1, 2018 to October 1, 2019) (the "2018 Policy," and jointly with the 2017 Policy, the "Policies") to Essential Utilities. A copy of the 2017 Policy is attached as **Exhibit 5**. A copy of the 2018 Policy is attached as **Exhibit 6**.

27. It is undisputed that Aqua Illinois is insured under the Policies issued by Defendants to Essential Utilities.

28. As coverage has been exhausted under the Chubb Policy, Plaintiffs are seeking indemnity and defense costs under the excess insurance provided by the Policies.

29. The Policies provide coverage for sums above the "retained limit" that Plaintiffs, as the "insured" is obligated to pay as damages because of "bodily injury" or "property damage" to which the applicable Policy applies.

30. "Retained limit" is defined in the Policies as either: (i) the total applicable limits of "scheduled underlying insurance" and any applicable limit of "other insurance" or (ii) the amount shown in the Declarations as the "Self-Insured Retention" [$25,000] applicable to each "occurrence" resulting in damages not covered by "scheduled underlying insurance" or "other insurance."

31. It is undisputed that the Chubb Policy is not on the Schedule of underlying insurance listed in the Policies and that the Chubb Policy constitutes "other insurance."

32. Accordingly, Plaintiffs are entitled to coverage for the Class Action Lawsuit under language contained in the Policies.

33. Certain definitions in the 2018 Policy, including the definition of Retained Limit, were amended by an endorsement to the 2018 Policy - Endorsement CU0075 0812 – The Designated Coverage Retained Limit Amendatory Endorsement (the "Retained Limit Endorsement").

34. The Retained Limit Endorsement, however, only applies to the coverages listed in the Schedule of Retained Limits. The Retained Limit Endorsement provides that it "modifies insurance" under the 2018 Policy: "Solely as respects coverages listed in the Schedule of Retained Limits (CU00168). . ."

35. Unlike the 2017 Policy, the 2018 Policy includes a Schedule of Retained Limits (CU00168).

36. The Schedule of Retained Limits (CU00168) identifies three types of coverages:

    Automobile Liability – Foreign

    Employer's Liability – Foreign

    General Liability – Foreign.

37. The Schedule of Retained Limits is not applicable to this matter as it does not identify any domestic coverage applicable to the Class Action Lawsuit. The Retained Limit Endorsement, therefore, does not apply, as the Retained Limit Endorsement only applies: "Solely as respects coverages listed in the Schedule of Retained Limits . . ." See Retained Limit Endorsement.

38. Regardless, Defendants claim that the coverage sought by Plaintiffs in this matter appears on the Schedule of Retained Limits as $1,000,000. Specifically, in a June 10, 2020,

reservation of rights letter, written by John Ott, Vice President, Claims Expert, Corporate Solutions Department for Swiss Re Corporate Solutions, Mr. Ott stated:

> "Retained limit" is defined in the 2018-2019 NAE Policy as "the applicable limit(s) listed in the Schedule of Retained Limit(s)." The Schedule of Retained Limits lists $1 million each occurrence and states that defense is in addition to the limits.

A copy of Mr. Ott's June 10, 2020 letter is attached as **Exhibit 7.**

39. Thus, if Mr. Ott were correct, that the coverage sought by Plaintiffs appears on the Scheduled of Retained Limits as $1,000,000 (which it does not), then the Retained Limit Endorsement would apply, and under the Retained Limit Endorsement, the definition of Retained Limits would be modified, according to the Defendants, to mean $1,000,000.

40. Therefore, whether viewed under the language in the Policies or the language in the Retained Limit Endorsement to the 2018 Policy, Plaintiffs are entitled to coverage as Plaintiffs have exhausted $5,000,000 in coverage under the Chubb Policy, which is well over the $1,000,000 Retained Limit claimed to be in effect by Defendants.

**Duty to Defend Under the Policies**

41. The Policies require the Defendants to defend the Plaintiffs under an unequivocal duty to defend. Ex. 5 and 6, Section III.

42. Specifically, the Policies make clear Defendants have a "duty to defend the "insured" against any "suit" claiming damages for "bodily injury" or "property damage" or "personal and advertising injury," even if meritless, false or fraudulent to which this insurance applies when:

>  1. the applicable limits of "scheduled underlying insurance" have been exhausted by payment of "loss" to which this policy applies and the total applicable limits of "other insurance" have been exhausted; or

2. damages claimed for "bodily injury," "property damage" or "personal and advertising injury" are

  a. not covered by "scheduled underlying insurance" or any "other insurance," and
  b. the applicable Self-Insured Retention has been exhausted by payment of "loss" covered by this Policy.

Ex. 5 and 6, Section III.

43. Here, it is undisputed that none of the limits of "scheduled underlying insurance" apply and the limits of the Chubb Policy, which is "other insurance" have been exhausted, therefore Defendants' duty to defend has been triggered.

44. The Defendants have acknowledged a duty to defend under the Policy but claim that the self-insured retention included in a pollution endorsement annexed to the Policy has not yet been reached. Specifically, Mr. Ott, in his June 10, 2020 letter stated: "It is our understanding that this SIR has not been exhausted. Therefore, NAE has **no current duty to defend**." Ex. 7

45. The SIR referenced by Mr. Ott, however, does not limit the duty to defend in the Policy. Indeed, the duty to defend provisions make no reference to the self-insured retention stated in the pollution endorsement.

46. The Defendants' duty to defend has been triggered as Plaintiffs have exhausted the Chubb Policy and have paid amounts which Plaintiffs have been legally obligated to pay.

47. Each of the Policies contains limits of insurance of $10,000,000 per occurrence and in the aggregate, with "Defense" in addition to such limits.

48. Plaintiffs seek a declaration that Defendants are obligated to indemnify Plaintiffs commencing at the exhaustion of the $5,000,000.00 Chubb Policy and defend Aqua Illinois under Defendants' duty to defend.

9

### Defendant's Position – Pollution Exclusion

49. Defendants have taken the position that if Plaintiffs are entitled to coverage under the Policies, coverage would only commence at the $15,000,000.00 level. In other words, Defendants contend that Plaintiffs must first exhaust the $5,000,000 Chubb Policy and then must self-fund a $10,000,000 gap in coverage until $15,000,000 is reached.

50. In support of this position, the Defendants rely on certain pollution exclusions which are annexed to the 2017 Policy as Endorsement DR 14 896 1017 and to the 2018 Policy as Endorsement MF 14 896 1017, titled "Pollution Exclusion – Named Peril Exception with Self-Insured Retention (the "Pollution Endorsement").

51. The Pollution Endorsement excludes: "Damages arising out of the actual or threatened discharge, dispersal, seepage, migration, release or escape of pollutants anywhere in the world" (the "Pollution Exclusions").

52. The Pollution Exclusions are ambiguous and unenforceable for several reasons.

53. First, the United States District Court for the Western District of Pennsylvania in *Netherlands Ins. Co. v. Butler Area Sch. Dist.*, 256 F. Supp. 3d 600, 612 (W.D. Pa. 2017), a matter which is substantially similar to the present matter, the court found the above "Pollution Exclusions are ambiguous in the context of an alleged exposure to lead and/or copper in drinking water; and therefore, must be interpreted in favor of coverage."

54. The court noted:

> [B]oth the Supreme Court of Pennsylvania and the Superior Court of Pennsylvania have ruled that standard pollution exclusion language like that contained in the Policies at issue does not apply to a substance such as lead that is a component of a product that degrades over time rendering the substance incrementally bioavailable. These findings are similar to the facts, as here, where lead and copper are essentially components of the water system at Summit Elementary, which have degraded over time, thereby allegedly rendering the lead and copper bioavailable.

*Id.* at 612 (W.D. Pa. 2017).

55. Second, the complaint in the Class Action Lawsuit does not allege dispersal, seepage, migration, release, or escape of pollutants anywhere in the world. Rather, the complaint in the Class Action Lawsuit alleges that Aqua Illinois water (a non-pollutant) caused lead in the pipes in residents' homes to "<u>leach.</u>" Nowhere in the Pollution Exclusions is the word "leach" stated. Accordingly, at the least, there is an ambiguity as to the application of the Pollution Exclusions to the present matter.

56. Third, the Pollution Endorsement specifically provides:

> This exclusion does not apply and the "Insured" is not subject to the Self-Insured Retention stated in the Schedule above if the "retained limits" for the pollution liability risks described above exists or would have existed but for the exhaustion of such "retained limits."

57. Here, regardless of whether "retained limits" are as defined in the Policies (as the $5,000,000 "additional insurance" under the Chubb Policy) or as defined in the Retained Limit Endorsement (as $1,000,000), they have been exhausted and accordingly, and as stated in the Pollution Endorsement: "This exclusion [the Pollutions Exclusions] does not apply . . ."

**Exception to Pollution Exclusions – Alternative Argument**

58. Finally, even if the exclusion language in the Pollution Endorsement is applicable, the Pollution Endorsement contains exceptions to the Pollution Exclusions (the "Exceptions to the Pollution Exclusions"). The Exceptions to the Pollution Endorsement are:

> This exclusion will not apply to damages arising out of the scenarios described in paragraphs 1. and 2. below and in excess of the <u>Self-Insured Retention stated in the Schedule above</u>.
> . . .
> 2. The products-completed operations hazard or the presence of any contaminant, or pollutant, including hazardous substances, hazardous materials, within potable, reclaimed or recycled water that has been sold or distributed by a "named insured," provided that

11

the use occurs after the Named Insured has relinquished possession of the aforementioned water.

59. The Pollution Endorsement includes the following schedule.

**SCHEDULE**

| Coverage: | Pollution Exclusion – Named Peril Exception Self Retention Endorsement |
|---|---|
| Self-Insured Retention: | $10,000,000 |
| Per Occurrence: | $10,000,000 |

60. Thus, regardless of the Pollution Exclusions, the Pollution Endorsement provides that Plaintiffs are entitled to coverage, under a worst-case scenario, beginning at $10,000,000, not $15,000,000 as alleged by Defendants.

**Coverage Dispute and Bad Faith**

61. Defendants were provided with copies of the complaints in the Class Action Lawsuit and the State of Illinois Lawsuit in support of Plaintiffs' Claim for coverage under the Policies.

62. In response to Plaintiffs' notice of loss and Claim, Chubb acknowledged coverage and has advanced the limits of coverage of $5,000,000 Per the Pollution Product Condition (the "Sublimit").

63. In response to Plaintiffs' Claim, however, Defendants have refused to acknowledge coverage, and instead have advanced a series of differing and evolving grounds (indeed, changing story) for denying Plaintiffs' Claim, including, without limitation,

a. Loss related to the Class Action Lawsuit is not covered because it fails to allege "bodily injury" or "property damage," which is false;

b. The first exemption to the Pollution Exclusion, as modified by the Pollution Exclusion Endorsement, does not apply, which is incorrect because the first exception plainly states: "[t]his exclusion does not apply and the 'Insured' is not subject to the Self-Insured Retention stated in the Schedule above if the 'retained limits' for the pollution liability risks described above exists or would have existed but for the exhaustion of such 'retained limits'."

c. The second exemption to the Pollution Exclusion, as modified by the Pollution Exclusion Endorsement, applies but Defendants maintain until Plaintiffs have expended the "Self-Insured Retention" of $10,000,000 in the Schedule to the Pollution Exclusion Exception Endorsement plus the exhaustion of the $5,000,000 Sublimit of the Chubb Policy, Defendants are not required to provide coverage, which is incorrect because the first exemption applies to Plaintiffs' claim, as explained above.

d. The Duty to Defend is not triggered because the "retained limit" has not been exhausted, which Plaintiffs believe is factually incorrect;

e. The Pollution Exclusion Endorsement applies, which Plaintiffs dispute based on the definition of "pollutants" in the Policies, and

f. The Damage to Impaired Property Exclusion applies to bar coverage, which is factually incorrect because the property damage at issue in the claim for coverage is the property of others, not the property of the insured.

64. Plaintiffs have communicated extensively with Defendants for nearly two years to obtain coverage under the Policies, but Defendants have refused to acknowledge coverage and have reserved all rights.

65. Defendants' refusal to perform its duty to defend and to provide coverage has adversely affected Plaintiffs and deprived Plaintiffs of access to additional layers of coverage which only become available after exhaustion of the coverage provided by the Policies.

66. In a convoluted and self-serving argument made in bad faith, the Defendants have gone so far as to claim that the main Policies, as distinct from the endorsements, do not provide coverage, but rather that coverage is only afforded through the Exceptions to the Pollution Exclusions. Specifically, in their October 8, 2020 coverage letter, Defendants asserted:

> As an initial matter, the NAE policy's standard forms do not provide coverage for pollution claims. Pollution coverage is only provided through the Pollution-Exclusion – Named Peril Exception with Self Insured Retention Endorsement (the "Pollution Endorsement") (Appendix A).

The October 8, 2020 coverage letter is attached as **Exhibit 8**.

67. In other words, Defendants, in a baffling argument contrary to established law regarding policy interpretation, and presumably to attempt to avoid the shifting burden of proof which requires the Defendants to prove an applicable exclusion, argue that an exception to an exclusion provides coverage, but the Policies themselves do not.

68. Defendants fail to acknowledge that if an exception to an exclusion applies, this simply means that an exclusion does not apply and that the main Policy provides coverage.

69. Further, Defendants' contention that the Policies attach at $15,000,000 is made in further bad faith as this argument is contrary to the very policy language upon which Defendants attempt to rely.

70. Specifically, Defendants contend that the $10,000,000 self-insured retention, which is specifically referenced in the Exceptions to Pollution Exclusions, should be $15,000,000 not the

14

$10,000,000 appearing in the schedule Defendants base this argument on Paragraph A to the Pollution Endorsement which states:

> A. Our obligation to pay damages on your behalf pursuant to this endorsement applies only to the amount of damages in excess of the:
>
> 1. Self-Insured Retention amount stated in the Schedule above as applicable to such coverage; and
>
> 2. "retained limits."

71. Paragraph A, however, is nowhere referenced in the Exceptions to the Pollution Exclusions. Indeed, the Exception to the Pollution Exclusion only makes reference to the "Schedule."

72. Paragraph A is therefore not applicable to the Exceptions to the Pollution Exclusions.

73. Further, the Defendants contention that "retained limits" referenced in Paragraph A to the Pollution Endorsement is the $5,000,000 Chubb Policy is directly conflicted by their argument that the retained limits are $1,000,000.

74. Defendants are acted in bad faith in defining terms under the Policies to best suit their purposes, even when their definitions conflict with each other, depending on which policy provision they are reading.

## COUNT I – BREACH OF CONTRACT

75. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as though set forth herein in their entirety.

76. Plaintiffs have performed and satisfied all of the terms, conditions, covenants, and obligations imposed on and required of it under the terms of the Policies, or by law.

77. The Loss sustained by Plaintiffs is covered under the Policies.

78. Defendants have breached their obligations under the Policies by failing and refusing to accept Plaintiffs' tendered Claim.

79. Defendants' refusal to pay the Claim is a material breach of the Policies.

80. Defendants are in breach of their duty to defend under the Policies.

81. As a direct and proximate result of Defendants' breach of the Policies, Plaintiffs have been deprived of the benefit of insurance coverage under the Policies for which Plaintiffs paid substantial premiums, and Plaintiffs will incur significant costs, in an amount of more than $75,000, associated with their defense of the Class Action Lawsuit and the State of Illinois Lawsuit that should be paid by Defendants.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants in an amount more than $75,000, plus interest and costs, and such other relief as the Court may deem appropriate and proper under the circumstances.

## **COUNT II – BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**

82. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as though set forth herein in their entirety.

83. Defendants, as insurers, owe a duty of the utmost good faith and fair dealing to Plaintiffs, as Defendants' insured.

84. Defendants had a burden to exercise reasonable care in investigating the Claim fairly and objectively.

85. Defendants could only reject the Claim where good cause exists to do so.

86. Defendants have breached their duty to deal in good faith and fairly with Plaintiffs by, among others, not exercising reasonable care in investigating the Claim fairly and objectively, unreasonably delaying coverage for covered losses and defense costs under the Policies, not

responding to the Claim, acting with reckless disregard of Plaintiffs' rights under the Policies, lacking any good faith basis or reasonable basis for refusing to respond to acknowledge the Claim and coverage, thereby compelling Plaintiffs to initiate this lawsuit to obtain benefits due and owing under the Policies.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants in an amount more than $75,000, plus interest and costs, and such other relief as the Court may deem appropriate and proper under the circumstances.

### COUNT III – BAD FAITH UNDER 42 Pa.C.S. § 8371

87. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as though set forth herein in their entirety.

88. Through the Claim, Plaintiffs have supplied Defendants with evidence of the Loss and that such Loss falls within the Policies' coverage.

89. Despite having received the Claim, Defendants have breached their duty to deal in good faith and fairly with Plaintiffs by, among others:

    a. Unreasonably and frivolously delaying and refusing to provide coverage for covered losses and defense costs under the Policies;

    b. Not exercising reasonable care in investigating the Claim fairly and objectively;

    c. Interpreting the provisions of the Policies in a manner that favors Defendants' interests over the interests of their insured;

    d. Construing the Policies in a manner that denies coverage rather than finding coverage;

e. Refusing to deal with its insured in good faith and intentionally ignoring the repeated written and oral communications of reasonable grounds for recognizing coverage, and Loss under the Policies;

f. Refusing to conduct any investigation of the nature and extent of the bodily injury and property damage described in the Class Action Lawsuit, the State of Illinois Lawsuit and the Claim;

g. Acting with a dishonest purpose as to Plaintiffs;

h. Acting with reckless disregard for Plaintiffs' rights under the 2018 Policy;

i. Avoiding payment to Plaintiffs for their purposes and financial gain;

j. Failing to pay the Claim in whole or in part;

k. Failing to pay the Claim timely;

l. Evading the spirit of the bargain;

m. Intentionally and recklessly failing to perform under the Policies and law;

n. Interfering with Plaintiffs' ability to defend and resolve the Class Action Lawsuit and the State of Illinois Lawsuit; and

o. Compelling Plaintiffs to institute this action to obtain benefits due and owing to it under the Policies.

90. Defendants do not have a reasonable basis for refusing to provide benefits to Plaintiffs under the Policies.

91. Defendants knew they had no reasonable basis for refusing to provide benefits to Plaintiffs under the Policies but continue to ignore it anyway.

92. Despite repeated demands by Plaintiffs for Defendants to investigate the Claim and provide coverage under the Policies, Defendants refused to investigate the Claim or provide coverage under the Policies.

93. Defendants' failure to and refusal to honor the Claim constitutes bad faith within the meaning of 42 Pa.C.S. § 8371.

WHEREFORE, Plaintiffs demand judgment in its favor and against Defendants under 42 Pa.C.S. § 8371 for damages in an amount more than $75,000, plus interest and costs, punitive damages, attorneys' fees, and such other relief as the Court may deem appropriate and proper under the circumstances.

## COUNT IV– DECLARATORY JUDGMENT/RELIEF

94. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as though set forth herein in their entirety.

95. Defendants have failed and/or refused to discharge their responsibilities and obligations under the 2018 Policy and in a manner consistent with Essential's rights.

96. Plaintiffs have not contributed to the causes of the matters complained of herein; to the contrary, Plaintiffs at all times acted in good faith and within the scope and terms of the Policies.

97. Plaintiffs relied on the terms of the Policies as identifying coverage and the duties and obligations of Defendants to Plaintiffs in the event of a Claim and Loss as described in the Policies and herein.

98. Defendants must provide coverage for the Claim as set forth herein and be estopped from denying coverage to Plaintiffs for the Claim.

99. A judicial declaration and declaratory judgment are necessary and appropriate at this time so that Plaintiffs may ascertain their rights under the Policy.

WHEREFORE, Plaintiffs request that this Court enter and declare judgment in its favor and against Defendants as follows:

    a.    Plaintiffs are Insured under the Policies;

    b.    That the Claim is a covered Occurrence under the Policies;

    c.    That Defendants have an obligation to accept and pay the Claim in full;

    d.    That Defendants are obligated to assume Plaintiffs' Defense Costs and associated costs in the Class Action Lawsuit and State of Illinois Lawsuit;

    e.    That Defendants fully reimburse Plaintiffs for all damages and costs, including reasonable attorneys' fees, incurred by Plaintiffs, including in connection with this declaratory judgment action; and

    f.    For such other and further relief that the Court, in its discretion, deems necessary, just, and appropriate under the circumstances.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all claims and issues of the Complaint so triable.

KANG HAGGERTY LLC

By:   */s/ Edward T. Kang*
      Edward T. Kang
      Kandis Kovalsky
      Gregory H. Mathews
      123 S. Broad Street, Suite 1670
      Philadelphia, PA 19109
      ekang@kanghaggerty.com
      kkovalsky@kanghaggerty.com
      gmathews@ kanghaggerty.com
      P: (215) 525-5850
      F: (215) 525-5860

Dated: April 21, 2022         *Attorney for Plaintiffs*